IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PENDLETON DIVISION


JESSICA MARQUEZ,                                           CV-09-1254-SU

                   Plaintiff,                         FINDINGS AND
                                                          RECOMMENDATION
v.

HARPER SCHOOL DISTRICT NO. 66,
 a public entity, also known as MALHUER
COUNTY SCHOOL DISTRICT NO. 66;
and DENNIS SAVAGE, Harper School
District No. 66 Superintendent;
LYNN HAUETER, member of Harper
School District No. 66 Board of Directors;
SHELLY DENNIS, Chair, Harper School
District No. 66 Board of Directors; LISA
FISHER, member of Harper School
District No. 66 Board of Directors;
RON TALBOT, Principal, Harper School
District No. 66; BARBARA OLSON,
member of Harper School District No. 66
Board of Directors, each and all in their
 individual and official capacities,

                  Defendants.

_____

SULLIVAN, Magistrate Judge:

Plaintiff Jessica Marquez ("Marquez") filed claims for sex-based discrimination and retaliation in violation of Title VII, 42 U.S.C. § 2000e-17, and O.R.S. 659A.030, against Harper School District No. 66, also known as Malheur County School District No. 66 ("school district"), school superintendent Dennis Savage ("Savage"), school principal Ron Talbot ("Talbot"), school board chair Shelly Dennis ("Dennis), and school board members Lynn Haueter ("Haueter"), Lisa Fisher ("Fisher"), and Barbara Olson ("Olson") (collectively "defendants"). Marquez also brings common law claims for wrongful termination, intentional infliction of emotional distress, and negligence. The court has original subject matter jurisdiction over Marquez's Title VII claims, 28 U.S.C. § 1331, and supplemental jurisdiction over her state law claims, 28 U.S.C. § 1367.

Presently before the court is defendants' motion for summary judgment (docket #27) and Marquez's partial motion for summary judgment (docket #30). For the reasons discussed below, plaintiff's motion should be denied, and defendants' motion should be granted in part and denied in part.

## LEGAL STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Summary judgment is not proper if material factual issues exist for trial. *See, e.g., Celotex Corp. v. Catrett,* 477 U.S. 318, 322 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986); *Warren v. City of Carlsbad,* 58 F.3d 439, 441 (9th Cir. 1995), *cert. denied,* 516 U.S. 1171 (1996). In evaluating a motion for summary judgment, the

district courts of the United States must draw all reasonable inferences in favor of the nonmoving party, and may neither make credibility determinations nor perform any weighing of the evidence. *See, e.g., Lytle v. Household Mfg., Inc.,* 494 U.S. 545, 554-55 (1990); *Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 150 (2000).

The substantive law governing a claim or defense determines whether a fact is material. *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n,* 809 F.2d 626, 630 (9th Cir. 1987). The court must view the inferences drawn from the facts "in the light most favorable to the nonmoving party." *Id.* (citation omitted). In employment discrimination cases "very little evidence" is required to survive summary judgment "because the ultimate question is one that can only be resolved through a searching inquiry-one that is appropriately conducted by the fact finder upon a full record." *Schnidrig v. Columbia Mach.,* 80 F.3d 1406, 1410 (9th Cir.) (internal quotations, citation omitted), *cert denied,* 519 U.S. 927 (1996). "In evaluating motions for summary judgment in the context of employment discrimination, [the Ninth Circuit has] emphasized the importance of zealously guarding an employee's right to a full trial, since discrimination claims are frequently difficult to prove without a full airing of the evidence and an opportunity to evaluate the credibility of the witnesses." *McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1112 (9th Cir. 2004).

## BACKGROUND[1]

Harper is a small community in Eastern Oregon, with one school district and one school that employs approximately 20 to 25 teachers, administrators, and non-licensed ("classified")

---

[1] Both parties have submitted documents with various attachments, including multiple excerpts of depositions attached to different documents. Unless otherwise indicated, all of the citations are directly to the authenticating depositions.

Page 3 - FINDINGS AND RECOMMENDATION

employees.  (Savage Depo. at p. 13-14.)  The superintendent oversees all the employees and reports to the school board.  (*Id*. at p. 14-15.)  Savage was the district's superintendent for eight years, retiring in June 2008.  (*Id*. at p. 7.)  Prior to Savage's retirement, Talbot was the principal and in training to assume full superintendent duties upon Savage's retirement.  (*Id*. at pp. 15-16.)  Talbot began taking on many of the superintendent duties starting in April or May 2008.  (*Id*.;  Talbot Depo. at pp. 67-68, 71.)

Marquez was hired to fill one of two Custodian/Maintenance/Groundskeeper positions, effective July 1, 2007.  (Marquez Depo. (Vol. I) at p. 121; Ex. 105.[2])  At that time, the other position was filled by Tony Casiano ("Casiano").  (Savage Depo. at p. 33.)  Casiano had held the position since the fall of 2003, having been hired to replace Harold Bertalotta ("Bertalotta"), the school district's original custodian.  (Tuttle Depo. at pp. 7-9.)  The school district had also employed a second, part-time custodian, Margaret Tuttle ("Tuttle") who worked with Bertalotta.  (*Id*.)  At some point after Tuttle was hired, she and Bertalotta agreed on a division of the custodial duties, with Bertalotta performing more groundskeeping and maintenance work, and Tuttle performing more of the cleaning, though many duties were shared.  (*Id*.)  They created a list reflecting this division of duties, which was passed down to each subsequent custodian.  (Savage Depo. at pp. 45, 104.)  When Casiano replaced Bertalotta, he and Tuttle continued with the division of duties that Bertalotta and Tuttle had agreed upon.  (Tuttle Depo. at pp. 8-9.)  When Tuttle retired in 2006, Kelly Conro ("Conro") was hired to replace her, with the division of duties remaining the same as it had been between Tuttle and Casiano.  Casiano did all the

---

[2]  Both parties have submitted numerous copies of some of the exhibits referred to in the depositions.  All citations are to the exhibit number as referred to in the depositions.

maintenance and outside work and Conro did all the cleaning and inside work. (Conro Depo. at pp. 8-9, 24.)

When Conro quit, the school district put out an ad for a replacement custodian, and Marquez applied, after hearing about the position by word of mouth. (Marquez Depo. (Vol. I) at 59.) Marquez's interview was conducted by a hiring committee, which included principal Talbot and school board chair Dennis. (Dennis Depo. at p. 18.) During the course of the interview, when discussing the duties the position required, Marquez mentioned that she had difficulty with heights and discussed her past experience as a janitor, including her familiarity with chemicals. (Id. at pp. 18-27; Marquez Depo. (Vol. II) at pp. 61-62.) While Dennis does not recall whether she utilized a written job description during the interview, she noted that the interview process was aimed at finding someone to do the cleaning inside the school. (Dennis Depo. at pp. 27-28.) Talbot recalls that they discussed job duties such as cleaning the bathrooms, mopping, and sweeping. (Talbot Depo. at p. 34.)

At the time Marquez was hired, there was a single operative job description for the position, entitled "Janitor," which encompassed a wide range of duties including maintenance, groundskeeping, and custodial work. (Marquez Depo. (Vol. II) at p. 120; Talbot Depo. at p. 65; Ex. 1). Despite the existence of this job description, it appears as though the specific division of tasks was governed by a different document, which divided up responsibilities among the two custodians, Casiano and Tuttle, employed prior to Marquez's employment. (Marquez Depo. (Vol. I) at p.62-63; Talbot Depo. at p. 56; Ex. 102.) When Marquez began work, she received her daily tasks from Casiano. (Marquez Depo. (Vol. I.) at p. 65, 71, (Vol. II.) at p. 31.) At that time, Marquez believed she had been hired to perform the same duties as Casiano. (Id. at p. 70;

Marquez Depo. (Vol. II.) at p. 21.)

After being hired in July 2007, both Casiano and Marquez performed maintenance and groundskeeping work.  (*Id*. (Vol. I) at pp. 69-70.)  Most of the outside groundskeeping and maintenance work is done during the summer months when school is not in session.  *Id*. (Vol. II) at pp. 47-48; Steele Depo. at pp. 58-59.)  Once school started, Marquez requested a more detailed list of cleaning responsibilities from school board member Karen Steele ("Steele"), who provided the list created by the previous custodians.  (Marquez Depo. (Vol. I.) at p. 69, (Vol. II.) at pp. 21, 24, 28-31; Ex. 102.)

During the course of the school year, Marquez alleges that Casiano directed her to perform the bulk of the cleaning tasks, made demeaning comments to her based on her sex, sabotaged her work, and restricted her access to tools and other equipment necessary for her to perform any maintenance or outside work, instead giving her only a hammer, putty knife, and a pink, flowered screwdriver to use as her tools.  (*Id*. (Vol. I) at pp. 57, 63, 65, 152-56, 158-59, 212-13, 234, 234-35, (Vol. II) at pp. 31, 44, 46-47.)  Marquez routinely cleaned all the toilets in the school.  (*Id*. (Vol. II) at pp. 62-63.)

At some point, Marquez requested and was provided a key to the tractor.  *Id*. (Vol. I) at p. 213.)  However, shortly thereafter, the tractor was parked in the shop building to which she did not have a key.  (*Id*.)  Casiano did all of the maintenance work on the school boiler and in the winter took care of snow and ice removal.  (Steele Depo. at p. 58.)  According to Marquez, she was not allowed access to the shop building, and Casiano "harassed and tormented" her by putting oil on the gym floor after she had cleaned it, spraying substances on the drinking fountains after she'd cleaned them, and flushing the toilets after she had just placed cleaner in the

bowls and before she could come back to scrub them.  (Marquez Depo. (Vol. I) at pp. 151-59.)

Marquez was not provided training on first aid/CPR or on asbestos and boiler safety, but Casiano

was.  (*Id*. at pp. 185-88, (Vol. II.) at pp. 4, 6-11, 73.)

 Savage granted Marquez's request that she work a "solid chunk of hours" rather than the

split shift hours she had been working.  (Savage Depo. at p. 202.)  Savage denied her request to

work four 10-hour days during the school year, though he permitted it during the summer and

during winter and spring break when there were no students on campus.  (*Id*.)  Savage also

denied Marquez's request to work nights because he did not think it would be "appropriate for a

young lady to work alone late at night," though Casiano was sometimes allowed to work alone.

(*Id*. at pp. 61, 202-03.)

At some point, Marquez spoke to school board member Steele about her issues with

Casiano, namely that she felt that her work was superior to his and that he was not performing his

share of the duties.  (Steele Depo. at pp. 9-10.)  In response, Steele told her that if she had issues

with Casiano, she needed to bring that up with superintendent Savage.  (*Id*. at p. 10.)  After this

conversation, Steele told superintendent Savage that Marquez had spoken to her about being

unhappy with Casiano and that she had referred her to Savage in order to address those issues.

(*Id*. at pp. 10-11.)

Sometime in late 2007 or early 2008, Marquez had a meeting with superintendent Savage

and principal Talbot to report what Marquez perceived as Casiano's harassment of her and the

unequal division of duties.  (Marquez Depo. (Vol. II) at pp. 80-81; Savage Depo. at p. 84.)

Savage recalls that Marquez approached him several times prior to this meeting to complain

about Casiano, but characterizes those complaints as involving his quality of work rather than

Page 7 - FINDINGS AND RECOMMENDATION

discrimination or harassment.  (Savage Depo. at pp. 49-52.)  According to Savage, Marquez never talked about being assigned to clean all the bathrooms, or that she believed Casiano was sabotaging her work.  (*Id*. at p. 56.)  Each time, Savage let Marquez know that she was doing a good job and that Savage  was not at liberty to discuss another employee's job performance with Marquez.  (*Id*. at pp. 49-52.)

According to Marquez, Savage told her during the meeting in late 2007 or early 2008, that "the bathrooms have never been cleaner, that she was hired "more for cleaning," and that Casiano could not be expected to get things "woman clean."[3]  (*Id*. (Vol. I) at pp. 128-30, 176.) Savage presented Marquez with an "ethics" policy stating that complaining about other employees could result in discipline or termination.  (Marquez Depo. (Vol. I) at p. 129, (Vol. II) at p. 60; Savage Depo. at pp. 76-79.)  Savage also told Marquez that he would  recommend to the school board that her "probation" be extended because he wanted to see how she and Casiano worked together through the winter athletic schedule.  (Marquez Depo. (Vol. I) at pp. 129-30; Savage Depo. at pp. 83-85.)  Savage assured Marquez that her work performance was satisfactory, but that he wanted to implement a 12-month probationary period for her even though she had not been on probation.  (Savage Depo. at pp. 86-88; Talbot Depo. at pp. 41-44.) A twelve month probationary period would have allowed an employee to be released without cause.  Savage admits that at the time he made this statement, he assumed that all classified

---

[3]  Talbot testified that this was the only time he was present when Marquez complained to Savage about Casiano, and that he was present only because Savage called him into the office after Marquez was already present.  (Talbot Depo. at pp. 42-44.)  He does not recall the substance of her complaints about Casiano, but remembers that Savage commented on her satisfactory cleaning, provided her with the ethics policy, and did not use the phrase "woman clean."  (*Id*.)

employees such as Marquez had a six-month probationary period, when in fact there was no probationary policy in effect for any new employees. (Savage Depo. at pp. 86-87; Steele Depo. at p. 53.) At the school board meeting on January 9, 2008, the board extended the probationary period for Marquez and voted to adopt a policy to impose a probationary period for all new employees. (Talbot Depo. at p. 72; Fisher Depo. at p. 29; Ex. 13.)

When Marquez asked Talbot for guidance in filing an internal complaint against Savage for discrimination, Talbot informed Marquez that she could not take such a complaint directly to the school board, but would have to submit her complaint to Savage. (Marquez Depo. (Vol. I) at pp. 219-23; Talbot Depo. at pp. 49-50, 52-53.) According to Marquez, instead of giving her a copy of the form she needed, Talbot pointed to a section in the policy book about "Staff Complaints," covering the rest of the page with his hand, leading Marquez to believe he was hiding something from her. (Marquez Depo. (Vol. I) at pp. 220-22, (Vol. II) at pp. 58-59.) The policy she ultimately used was one for "Complaint Procedure," which did not require her to submit her complaint directly to Savage. (*Id*. (Vol. I) at p. 222-23.)

Talbot recalls that board member Steele informed him that Marquez wanted to file a complaint and that Talbot needed to get the relevant policy for Marquez. (Talbot Depo. at pp. 38-39.) According to Talbot, it was not until he provided Marquez the form that she informed him that she wanted to file a complaint against Savage. (*Id*. at pp. 39-40.) Marquez does not remember Talbot giving her the written policy regarding grievance procedures involving the superintendent. (Marquez Depo. (Vol. II) at p. 57.)

Each time Marquez brought up her complaints to Savage, Talbot, and Steele, they consistently told her that Marquez was not responsible for Casiano's work and that she should

just get her work done.  (*Id*. (Vol. I.) at pp. 73-74; Steele Depo. at pp. 56-57.)  When Marquez

inquired about what her specific job duties were, they would refer her back to Casiano.

(Marquez Depo. (Vol. I) at pp. 73-74, 170.)

Around this same time, Marquez also spoke to two other defendants, school board chair

Dennis and board member Fisher, both women.  At some point before she made her formal

complaint, Marquez spoke to Dennis about how Casiano's cleaning was not as good as her own

cleaning, that Casiano did not always do a thorough job on other tasks such as laundry and

repairs, that she and Casiano disagreed about what cleaner to use on the gym floor, and that

Marquez was not permitted to use the tractor or lawn mower.  (Dennis Depo. at pp. 45-49, 52.)

Marquez also expressed concern that she had not received boiler safety and first aid/CPR

training, but that Casiano had received that training.  (*Id*. at pp. 48-49.)  At some point, Dennis

reviewed the relevant provisions of the school district's policy book with Marquez.  (*Id*. at p. 68.)

Sometime prior to February 22, 2007, Marquez went to school board member Fisher's

house and talked to her about the trouble she was having with Savage.  (Marquez Depo. (Vol. I)

at pp. 139, 144-46; Fisher Depo. at p. 8.)  Marquez told Fisher that she had spoken to Savage

about her problems but he had failed to respond.  (*Id*.)  Marquez brought the list of duties with

her and expressed to Fisher that she didn't think that the division of duties was fair.  (Fisher

Depo. at p. 8.)  Fisher helped Marquez to locate the appropriate complaint form in the policy

book.  (Marquez Depo. (Vol. I.) at pp. 145-46; Fisher Depo. at pp. 13-14.)  Other than providing

the complaint policy, Fisher did not provide any other advice about how to proceed.  (Fisher

Depo. at p. 14.)  Fisher told school board chair Dennis that Marquez had come to see her, but

Fisher did not take any other action in her capacity as a board member.  (*Id*. at p. 22.)

On or about March 1, 2008, Marquez submitted a written complaint to the school board against superintendent Savage, alleging that he discriminated and retaliated against her on the basis of her sex.  (Marquez Depo. (Vol. I) at pp. 136-37; Ex. 8.)  Marquez also made a list of proposed remedies., which included, among other things:

> (1) that her job description be followed;
> (2) that she be treated equally and the job duties divided equally and not along "stereotype lines;"
> (3) that she receive asbestos, boiler safety, and first aid/CPR training;
> (4) that Talbot replace Savage as the sole supervisor exercising direction and review of classified employees;
> (5) that she not be subject to Casiano's direct control;
> (6) that her harassment complaint be heard according to the grievance procedures in place;
> (7) to start with a "clean slate" with a new contract for the 2008-2009 school year, and no retaliation for filing a complaint; and
> (8) if the school board finds that unlawful discrimination or retaliation has been  perpetrated by a member of the staff, that the staff member be dismissed.

(Ex. 17.)  Marquez submitted her complaint to school board chair Dennis, who provided a copy to superintendent Savage.  (Marquez Depo. (Vol. I) at p. 138; Savage Depo. at p. 82.)  Savage placed Marquez on the agenda for the next board meeting, listing, "Discrimination Complaint - Jessica Marquez" as an agenda item.  (Savage Depo. at p. 101-03; Ex. 15.)  The agenda was publicly posted on school doors, at the post office, and at a nearby gas station for public view. (Marquez Depo. (Vol. I) at pp. 55-56; Savage Depo. at p. 103.)

At the school board meeting on March 11, 2008, Marquez requested that she be permitted to read a written statement during the public session.  (Marquez Depo. (Vol. I) at pp. 163-64; Dennis Depo. at pp. 94-96; Fisher Depo. at p. 16.)  Upon advice of Rebekah Cook, an attorney with the Oregon School Board Association ("OSBA"), Marquez was permitted to read her statement only in executive session.  (Savage Depo. at p. 178; Steele Depo. at p. 63; Dennis

Page 11 - FINDINGS AND RECOMMENDATION

Depo. at pp. 94-95; Fisher Depo. at pp. 16-17; Ex. 4.)  Marquez sought to offer supporting

documentation for her complaints, but the board declined to receive her evidence.  (Marquez

Depo. (Vol. I) at p. 165; Dennis Depo. at p. 127.)  Savage then read his own prepared statement,

after which Marquez was dismissed from the session.  (Savage Depo. at p. 136; Dennis Depo. at

pp. 97-98; Fisher Depo. at pp. 25, 27, 35; Ex. 5.)  Even though board member Steele normally

took the minutes for executive sessions, school board chair Dennis excluded Steele from that

session and no minutes were taken.  (Steele Depo. at pp. 28, 53.)

In response to Marquez's complaint, school board chair Dennis prepared a letter to

Marquez with a draft of the board's remedies, dated March 18, 2008.  (Ex. 18.)  One of the

proposed remedies was to review the two custodial  job descriptions.  (*Id*.)  Separation of the

two janitor positions was intended to define the duties of Marquez's position as the one

performing more cleaning, whereas Casiano's duties and position would entail more maintenance

work.  (Haueter Depo. at p. 28.)  After receiving the letter, Marquez contacted Dennis and

expressed her fear that having two job descriptions would impose all the cleaning duties on her,

while giving all the maintenance duties to Casiano, thereby institutionalizing the sex-based

division of duties that formed the basis of her complaint.  (Marquez Depo. (Vol. I) at p. 199.)

Board member Haueter noted that he did not think that the new job descriptions would satisfy

Marquez's concern about not getting equal access to maintenance and outside tasks, but noted

that Marquez was hired as the inside building janitor.  (Haueter Depo. at p. 29.)  Board member

Olson stated that she thought the board's remedy would satisfy Marquez.  (Olson Depo. at p. 24.)

In a special meeting on April 3, 2008, the school board unanimously voted to "approve

the remedies presented in Dennis' letter to Marquez in answer to Marquez's grievance

complaint." (Ex. 21.) Pursuant to the board's decision, Savage created two new job descriptions for the two employees, one for "maintenance/utility" and one for "custodian." (Savage Depo. at pp. 33-35, 116, 119-20, Exs. 2, 3.) These job descriptions are currently in place. (Talbot Depo. at pp. 66-67.)

Between the time she submitted her complaint but before she was provided with any remedies, Marquez contends that her job changed because defendants refused to allow her to perform tasks she felt were associated with her position, such as resetting a fire alarm, receiving maintenance supplies, and repairing a broken window. (Marquez Depo. (Vol. II) at pp. 32-33, 36-37, 39-40.) Although nobody told her that she could not perform any maintenance tasks, the way she was treated led her to believe that this was no longer part of her job. (*Id*. at pp. 33-34.) For instance, when a fire alarm went off at the school, Marquez responded first but was told to wait for Casiano to come turn it off. (*Id*. at p. 33.) When Marquez ordered plumbing supplies for clogged sinks, the supplies were delivered to Casiano and he performed the repair work. (*Id*. at pp. 35-44.) Marquez reported these incidents to Steele and Dennis, but they responded that she was hired more for cleaning and Casiano was hired more for maintenance. (*Id*. at pp. 36, 38-40, 117.)

On April 7, 2008, Marquez submitted a letter of resignation, expressing that she felt that the school board's action made continuing employment impossible because the remedies adopted merely formalized the behaviors and policies that had led to her complaints of unequal treatment. (*Id*. (Vol. I) pp. 79-80, 201-02, 205, (Vol. II) pp. 54-55; Ex. 19.) At the time of her resignation, Marquez felt as though the segregated job descriptions were already in place because after she read her statement at the board meeting, she was no longer allowed to perform any duties other

than cleaning, and that her situation would not improve because Savage was still the acting

superintendent.  (*Id*. (Vol. I) at pp. 49, 199, (Vol. II) at p. 118.)  Even though Savage was

supposed to retire in a few months, Marquez did not believe that anything would change because

Savage  had claimed he was retiring for several years, yet had not left.  (*Id*. (Vol. I) at pp. 54-55.)

After Marquez's resignation, Tyler Keister, a male, was hired in the "custodian" position,

while Casiano continued his duties under the "maintenance utility" position.  (Talbot Depo. at

pp. 66-67.)  Marquez claims that she has seen the new custodian do things that she was not

allowed to do, such as run the tractor.  (Marquez Depo. (Vol. II) at p. 83.)

Marquez subsequently filed a claim for unemployment compensation, a discrimination

complaint with the Oregon Bureau of Labor Industries ("BOLI"), and this lawsuit.

## ANALYSIS

Marquez brings several claims for disparate treatment and retaliation under various

provisions of federal and Oregon law as well as common law claims for wrongful discharge,

intentional infliction of emotional distress, and negligence.  Defendants seek summary judgment

on all claims on the grounds that Marquez cannot establish a *prima facie* case for any of her

claims.  Marquez seeks summary judgment on her federal and state discrimination and retaliation

claims because the undisputed facts establish that she was singled out and treated less favorably

on account of her sex, and that defendants retaliated against her for reporting unequal treatment.

## I.  Discrimination and Retaliation Claims (First, Second, Third, Fourth and Fifth Claims)

### A.  Legal Framework

Marquez alleges claims for disparate treatment and retaliation on account of her sex under

§ 1983, Title VII, and Oregon law.  Courts apply the same *prima facie* standard to federal and

state claims for disparate treatment and retaliation.  *See Henderson v. Jantzen, Inc.,* 79 Or.App. 654, 657, 719 P.2d 1322 (1986) (adopting U.S. Supreme Court's formulation of *prima facie* case).  The requirements for a § 1983 claim for equal protection by way of employment discrimination are the same as those for Title VII claims.  *Sischo-Nownejad v. Merced Comm. Coll. Dist.*, 934 F.2d 1104, 1113-14 (9th Cir. 1991), *superseded by statute on other grounds as stated in Dominguez-Curry v. Nevada Transp. Dep't.*, 424 F.3d 1027, 1041 (9th Cir. 1984); *see also Peters v. Lieuallen*, 746 F.2d 1390, 1393 (9th Cir. 1984) (finding that since a plaintiff could not demonstrate intentional discrimination for purposes of Title VII, he could not establish discrimination for purposes of § 1983).

The plaintiff carries the initial burden to establish a *prima facie* case of discrimination. *Lindahl v. Air France,* 930 F.2d 1434, 1437 (9th Cir. 1991) (citing *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802 (1973)).  To meet that burden, the plaintiff must offer evidence that gives rise to an inference of unlawful discrimination, "either through the framework set forth in *McDonnell Douglas* . . . or with direct or circumstantial evidence of discriminatory intent." *Vasquez v. County of Los Angeles,* 349 F.3d 634, 640 (9th Cir. 2003) (citation omitted).  "Direct evidence is 'evidence which, if believed, proves the fact of discriminatory animus without inference or presumption.' " *Id*. (quoting *Godwin v. Hunt Wesson, Inc.,* 150 F.3d 1217, 1221 (9th Cir. 1998)).  The plaintiff may also rely on the burden-shifting framework set forth in *McDonnell Douglas.*

Under *McDonnell Douglas,* a plaintiff alleging disparate treatment under Title VII must show that:  (1) she belongs to a protected class; (2) she was qualified for the position; (3) she was subject to an adverse employment action; and (4) similarly situated individuals outside her

Page 15 - FINDINGS AND RECOMMENDATION

protected class were treated more favorably.  *Chuang v. Univ. of California Davis,* 225 F.3d

1115, 1123 (9th Cir. 2000) (internal citation omitted).  To establish her *prima facie* case for

retaliation, Marquez  must show that:  (1) she is a member of a protected class or engaged in

protected activity; (2) she suffered an adverse employment action; and (3) a causal link exists

between her status or activity and the employment action.  *See Trent v. Valley Elec. Ass'n Inc.*,

41 F.3d 524, 526 (9th Cir. 1994).  "The requisite degree of proof necessary to establish a *prima*

*facie* case for Title VII . . . on summary judgment is minimal and does not even need to rise to

the level of a preponderance of the evidence."  *Wallis v. J.R. Simplot Co.*, 26 F.3d 885, 889 (9th

Cir. 1994) (citation omitted)

   In Title VII cases, "once the plaintiff has established a *prima facie* case, the burden of

production shifts to the defendant to articulate a legitimate, nonretaliatory explanation for its

decisions."  *Yartzoff v. Thomas*, 809 F.2d 1371, 1376 (9th Cir. 1987) (citation omitted), *cert*

*denied*, 498 U.S. 939 (1990).  The employer "need not prove the absence of retaliatory intent or

motive; it simply must produce evidence sufficient to dispel the inference of retaliation raised by

the plaintiff."  *Cohen v. Fred Meyer Inc.*, 686 F.2d 793, 796 (9th Cir. 1982) (citations omitted).

This is merely a burden of production as the ultimate burden of persuasion remains with plaintiff

at all times.  *Id*. at 796-97.

   Where an employer successfully gives such a reason for the employment action, "the

legally mandatory inference of retaliatory discrimination arising from the plaintiff's *prima facie*

case drops away."  *Yartzoff*, 809 F.2d at 1377 (citation omitted).  The plaintiff must then

demonstrate that the proffered reason is pretextual.  *Chuang,* 225 F.3d at 1124.  Pretext may be

established in one of two ways:  "(1) indirectly by showing that defendant's proffered explanation

is 'unworthy of credence' because it is internally inconsistent or otherwise not believable; or (2) directly, by showing that unlawful discrimination more likely motivated the employer." *Id.* at 1127 (citation omitted). "These two approaches are not exclusive . . . it is the cumulative evidence to which a court ultimately looks." *Id*. "When that evidence, direct or circumstantial *consists of more* than the [*prima facie*] presumption, a factual question will, almost always exist with respect to any claim of nondiscriminatory reason[,]" but "in those cases where the *prima facie* case consists of no more than the minimum necessary to create a presumption of discrimination . . . , plaintiff has failed to raise a triable issue of fact." *Wallis*, 26 F.3d at 890 (internal quotations, citation omitted) (emphasis and brackets in original). Here Marquez must do more than simply "establish a *prima facie* case and deny the credibility of [defendants'] witnesses." *Id*. (citation omitted).

**B. Sex Discrimination Claims (First, Second, and Fourth Claims)**

**1. *Prima Facie* Case**

A person suffers disparate treatment in employment "when he or she is singled out and treated less favorably than others similarly situated on account of [sex]." *McGinest*, 360 F.3d at 1121. Under *McDonnell Douglas,* Marquez must show that: (1) she belongs to a protected class; (2) she was qualified for the position; (3) she was subject to an adverse employment action; and (4) similarly situated individuals outside her protected class were treated more favorably. *Chuang,* 225 F.3d at 1123. For purposes of summary judgment, the parties dispute only the last two elements: whether Marquez was subject to an adverse employment action and whether she was treated differently than similarly situated individuals outside her protected class.

/ / /

Page 17 - FINDINGS AND RECOMMENDATION

### a. Adverse Employment Action

For a disparate treatment claim, an adverse employment action "materially affect[s] the compensation, terms, conditions, or privileges of . . . employment." *Davis v. Team Elec. Co.*, 520 F.3d 1080, 1089 (9th Cir. 2008) (brackets in original). The Ninth Circuit has held that being stripped of work responsibilities or being assigned different or more burdensome responsibilities can be an adverse employment action. *Kortan v. California Youth Auth.*, 217 F.3d 1104, 1113 (9th Cir. 2000). Assignment of more strenuous work, work with hazardous substances, and exclusion from important areas in the workplace have been found sufficient to establish a *prima facie* case. *Davis*, 520 F.3d at 1090-91.

Marquez alleges that she was subject to an adverse employment action when she was assigned different and more burdensome responsibilities than the male custodian. Defendants argue that division of duties on the grounds of allegedly sex-based stereotypes is not an adverse employment action sufficient for a disparate treatment claim because Marquez was not terminated, disciplined, or subject to any other action that materially affected the terms and conditions of her employment. Defendants' position is that Marquez was required to perform cleaning duties, which were wholly within her job description as a custodian, and the fact that she performed different duties than Casiano does not mean she was subject to an adverse employment action for purposes of establishing her *prima facie* case.

The record supports Marquez's assertion that she was assigned different responsibilities than the male custodian, despite the existence of a single operative job description in place at the time she was hired. When Marquez was first hired sometime in July 2007, she received her daily tasks from Casiano, the male custodian; during that time, both Marquez and Casiano performed

Page 18 - FINDINGS AND RECOMMENDATION

primarily maintenance and groundskeeping tasks.  (Marquez Depo. (Vol. I.) at p. 65, 69-71, (Vol. II.) at p. 31.)  Once school started, Casiano directed Marquez to perform the bulk of the cleaning work, including cleaning all of the toilets in the school, made demeaning comments to her based on her sex, and "harassed and tormented" her by sabotaging her work.  (*Id*. (Vol. I) at pp. 57, 152-59, (Vol. II) at pp. 31, 44, 46-47, 63-65.)  She was denied access to maintenance equipment like the tractor and tools, as well as access to certain areas of the school, such as the shop building.  (*Id*. (Vol. I) at pp. 151-59, 213.)  The only tools she was provided were a hammer, putty knife, and a pink, flowered screwdriver.  (*Id*. (Vol. I) at pp. 212-13, 234-35.)  She was not provided asbestos training, boiler training, or CPR/first aid training.  (*Id*. at pp. 185-88, (Vol. II.) at pp. 4, 6-11, 73.)  According to Marquez, when she brought her complaints to defendants, they told her to get her to just get her work done, and when she requested more information about what her specific job duties were, they gave her the division of duties created by the original custodians; thereafter, she was referred back to Casiano for further clarification of her responsibilities.  (*Id*. (Vol. I) at pp. 69, 73-74, 170, (Vol. II) at pp. 21, 24, 28-31; Ex. 102.)

At some point after submitting her complaint, Marquez alleges that defendants refused to allow her to perform any maintenance tasks whatsoever, such as resetting a fire alarm, receiving maintenance supplies, and repairing a broken window.  (*Id*. (Vol. II) at pp. 32-33, 36-37, 39-40.) When a fire alarm went off, Marquez responded first but was told to wait for Casiano to come turn it off, and when she ordered plumbing supplies, they were delivered to Casiano and he performed the repair work.  (*Id*. at pp. 33, 35-44.)  Ultimately, defendants formally adopted two new job descriptions, with one emphasizing cleaning duties and one maintenance and groundskeeping responsibilities.  (Savage Depo. at pp. 33-35, 116, 119-20; Talbot Depo. at pp.

Page 19 - FINDINGS AND RECOMMENDATION

66-67; Exs. 2, 3.)

Similar to the plaintiff in *Davis*, Marquez has provided evidence of a number of incidents that showed that her work responsibilities were different than her male coworker.  520 F.3d at 1090-91 (assignment of more strenuous work, work with hazardous substances, and less varied tasks than her male coworkers constituted adverse employment actions that materially affected the terms and conditions of employment); *see also Collins v. Potter*, 2010 WL 5376221, at *7 (S.D. Cal. December 22, 2010) (finding that being denied access to the parking lot during off-work hours did not sufficiently impact the terms, conditions, or status of employment so as to be considered an adverse employment action); *Tu v. Kaiser Foundation Health Plan of Northwest*, 2008 WL 3871742, at *9 (D. Or. August 19, 2008) (finding that a single assignment of more work than employee could complete in one day was not the type of assignment of more work responsibilities that would rise to the level of an adverse employment action).  Keeping in mind that the evidence required at this stage is minimal, the court concludes that Marquez has presented sufficient evidence that she was assigned different responsibilities on a basis of her sex, and thus, suffered an adverse employment action.

### b.  Treated Differently

In order to show that the employees allegedly receiving more favorable treatment are similarly situated, the plaintiff must establish, at the least, that she is similarly situated to those employees in all material respects.  *Moran v. Selig*, 447 F.3d 748, 755 (9th Cir. 2006).  Marquez must establish that a male in her position would not have had the same duties as she, namely that he would not be required to perform the bulk of the cleaning and indoor tasks and would instead be permitted to perform maintenance and groundskeeping work.

Page 20 - FINDINGS AND RECOMMENDATION

At the time the events underlying Marquez's complaint occurred, there were only two custodians employed by the school district, one male and one female, and just one operative job description, which encompassed cleaning, maintenance, and groundskeeping duties. The record establishes that Marquez and Casiano did not perform the same duties, since she performed most of the cleaning, and he most of the maintenance and groundskeeping. Every person employed as the second custodian to Casiano prior to Marquez's employment was a woman, and worked according to this same division of duties. Therefore, there are no real similarly-situated male employees in order to compare Marquez's treatment to, other than Casiano himself, and the record is clear that their duties were not the same.

Defendants point to that the fact that a male was hired to replace Marquez and that he performed the same division of duties with Casiano as Marquez, as evidence that she was not treated differently than similarly-situated male employees. It is well settled that post-complaint curative measures are irrelevant to a court's determination of whether a violation occurred prior to the filing of a Title VII complaint. *See Chuang*, 225 F.3d at 1129-30. Even if this were relevant to the similarly situated comparator analysis, Marquez's testimony indicates that she has seen the new male custodian performing tasks that were forbidden to her, such as running the tractor. (Marquez Depo. (Vol. II) at p. 83). Keeping in mind that the evidence required to "clear the . . . *prima facie* bar" is minimal, Marquez has presented evidence that she was treated differently than the male custodians. *Aragon v. Republic Silver State Disposal, Inc.*, 292 F.3d 654, 660 (9th Cir. 2002). While discriminatory animus is not the only inference that can be drawn, the court finds that Marquez  has satisfied the minimal burden necessary to establish her *prima facie* case at this stage in the analysis.

### 2. Employer Justification

Since Marquez has established a *prima facie* case for her disparate treatment claim, defendants must articulate legitimate non-discriminatory reasons for the adverse employment action. Defendants assert that the division of duties was not based on sex stereotypes, but was based on the historical division of duties among the two custodians, and that some of the duties required Marquez to be alone in the school at night, a practice which defendants considered unsafe. In support, defendants point out that Marquez performed the exact same duties that each of her predecessors performed, and that her replacement, who was male, continued to perform these duties. According to defendants, the fact that Marquez's duties changed once school started is not based on sex discrimination or stereotypes, but because once school started, the classrooms and other areas inside the school required much more attention, while in the summer when school was not in session, much of the outside maintenance and groundskeeping work is performed. Given the minimal burden at this stage, these are legitimate, non-discriminatory justifications for the actions taken by defendants.

### 3. Pretext

Because defendants have produced legitimate justifications for the adverse employment action, the burden now shifts back to Marquez to put forth specific and substantial evidence that these reasons are really a pretext for discrimination. Pretext may be established in one of two ways: "(1) indirectly by showing that defendant's proffered explanation is 'unworthy of credence' because it is internally inconsistent or otherwise not believable; or (2) directly, by showing that unlawful discrimination more likely motivated the employer." *Chuang,* 225 F.3d at 1127.

Page 22 - FINDINGS AND RECOMMENDATION

Marquez submits that the cumulative evidence establishes that defendants' explanation is unworthy of credence. In support, she offers discriminatory comments made by her supervisors that are indicative of gender bias. Savage did not permit her to work nights or weekends because he believed that it would not be safe for a "young woman" to be in the building alone. (Savage Depo. at. pp. 176-78.) When she first complained to Savage about Casiano's failure to perform his own cleaning duties and attempts to shift all cleaning responsibilities to her, he responded that she should not expect Casiano to get things "woman clean." (Marquez Depo. (Vol. I) at pp. 128-30.)[4] Board member Dennis testified that she heard Savage say words to the effect of "it's only illegal if you don't get caught," when discussing, in a very general sense, what actions the school board could and could not take. (Dennis Depo. at p. 133.)

Marquez also presents evidence from other women who experienced what they believed to be sex discrimination at the hands of defendants. Kelly Conro, who held the custodian position before Marquez, testified that Casiano directed her to do all the cleaning and he took on all the maintenance and groundskeeping tasks. (Conro Depo. at pp. 8-15, 20-23.) When she complained to Steele about the division of duties, Steele responded that she would take note of it, and while Casiano no longer asked her to clean his areas, he continued to "walk all over her," leaving her with the feeling that the situation was not really going to get better. (*Id*. at pp. 9-10, 17-19.) Boydette Williams, who worked as an on-call custodian prior to Marquez being hired, reported that when she was interviewed for Tuttle's position, Savage told her that "it wouldn't

---

[4] Whether Savage used this phrase is disputed, as principal Talbot, who was present at the meeting, did not recall that Savage used this phrase. (Talbot Depo. at pp. 42-44.)

look good for an unmarried woman to work with a married man."[5]  (Williams Decl. (docket #33), at ¶ 5.)  Sherri Shenk, former basketball coach, related similar instances of being treated poorly on the basis of her sex, including that she was not permitted to order supplies she needed, that the volunteer assistant coach, who was a male, was given more respect and deference than she was, and that at some point, she was required to pay for her meals when previously she had been provided free meals, along with all other staff and students.  (S. Shenk Depo. at pp. 7-8, 11-15, 21.)  Shenk never filed a complaint because she was worried about retaliation.  (*Id*. at p. 15.)

While hardly the only interpretation of the evidence, Marquez has provided specific and substantial evidence sufficient to demonstrate that defendants' reasons for the division of duties was a pretext for sex discrimination.  Accordingly, she has carried her burden under the *McDonnell Douglas* framework.

However, defendants vigorously dispute Marquez's interpretation of the evidence in support of her claim that the historical division of duties was based on stereotypical gender roles. While the record establishes that the duties were divided so that one person performed the bulk of the cleaning and the other the majority of maintenance and groundskeeping tasks, the record does not establish, one way or the other, whether the division of duties was based on some kind of discriminatory animus or stereotypical gender roles.  Such a conclusion is an ultimate issue of fact for the jury to decide after a full airing of the evidence and an opportunity to make credibility determinations, thereby making summary judgment on this claim inappropriate.  Accordingly, both motions should be denied for Marquez's First, Second, and Fourth Claims for disparate

_____

[5]  Defendants provide evidence that even if Savage uttered this statement, it was not true because the woman who was ultimately hired for Tuttle's position, Kelly Conro, was unmarried when she shared the custodian position with Casiano.  (Steele Decl. (docket #42) at p. 2.)

Page 24 - FINDINGS AND RECOMMENDATION

treatment under state and federal law.

**C.  Retaliation Claims (First, Third, and Fifth Claims)**

Marquez also alleges that defendants retaliated against her for reporting unequal treatment.  Though she brings claims under state statutes, the required elements for a *prima facie* case are the same as those required for Title VII retaliation claims, and the same *McDonnell-Douglas* burden shifting approach applies.  *See Stegall v. Citadel Broadcasting Co.*, 350 F.3d 1061, 1065-66 (9th Cir. 2003) (applying Title VII elements to state law retaliation claims); *Payne v. Apollo College-Portland, Inc.*, 327 F. Supp. 2d 1237, 1245 (D. Or. 2004) (applying Title VII elements to state law claim for retaliation brought under O.R.S. 659A.030(1)(f)).

**1.  *Prima Facie* Case**

To establish her *prima facie* case, Marquez  must show that:  (1) she is a member of a protected class or engaged in protected activity; (2) she suffered an adverse employment action; and (3) a causal link exists between her status or activity and the employment action.  *See Trent*, 41 F.3d at 526.  For purposes of summary judgment, the parties dispute only whether Marquez was subject to an adverse employment action.

Title VII's anti-retaliation provision, "unlike the substantive provision, is not limited to discriminatory actions that affect the terms and conditions of employment."  *Burlington Northern and Santa Fe Ry. Co. V. White*, 548 U.S. 53, 64 (2006); *see also Maxwell v. Kelly Svcs. Inc.*, 730 F. Supp.2d 1254, 1268 n. 5 (D. Or. 2010).  Thus, an "adverse employment action" for purposes of a retaliation claim is any action that is "reasonably likely to deter employees from engaging in protected activity."  *Ray v. Henderson*, 217 F.3d 1234, 1243 (9th Cir. 2000).  In support of her claim, Marquez alleges the following adverse employment actions: (1) when she approached

defendants about Casiano and the discriminatory work assignments, she was threatened with discipline under an ethics policy and placed on probation; (2) defendants misled her regarding how to file a complaint; (3) defendants publically published her name in connection with a discrimination complaint on the agenda posted in several places around town; (4) defendants refused to allow her to read her statement during the board's public session; (5) defendants formalized the discriminatory division of work assignments that formed the basis of her complaint; and (6) before the formal adoption of the two job descriptions, defendants refused to allow her to perform any maintenance tasks.  Ultimately, Marquez alleges that she was constructively discharged.

Extension of a probationary period has been found to constitute an adverse employment action for Title VII retaliation purposes.  *Thomas v. City of Beaverton*, 379 F.3d 802, 811-12 (9th Cir. 2004).  Although the record is clear that at the time Savage discussed probation with Marquez, he was under the mistaken impression that all classified employees such as Marquez had a six-month probationary period, when in fact, there was no such probationary policy in place.  (Savage Depo. at pp. 86-88.)  Even though Savage may have been unaware of Marquez's probationary status, the discussion of probation occurred during the same meeting Marquez complained to Savage and Talbot regarding Casiano's harassment and what she perceived were discriminatory work assignments.[6]  (*See* Marquez Depo. (Vol. I) at pp. 128-30, 176, (Vol. II) at

---

[6]  The parties dispute whether Marquez's complaints to the various board members were about discriminatory work assignments or whether she was merely complaining about Casiano's inadequate work performance.  This distinction is critical and the evidence supports both characterizations.  Informal complaints to a supervisor are considered protected activity for a retaliation claim, but general complaints about coworkers do not necessarily rise to the level of protected activity.  *See Passantino v. Johnson & Johnson Consumer Prods. Inc.*, 212 F.3d 493, 506 (9th Cir. 2000); *Jamal v. Wilshire Management Leasing Corp.*, 320 F. Supp. 2d 1060, 1079

pp. 60, 80-81, 129-30; Savage Depo. at pp. 49-52, 56, 76-79, 83-88; Talbot Depo. at pp. 42-44.)

At the next board meeting, the board extended the probationary period for the custodial position

an additional six months even though there is evidence that there was actually no probationary

period. (Talbot Depo. at p. 72; Fisher Depo. at p. 29; Ex. 13.) A reasonable jury could conclude

that the discussion and implementation of a probationary period so close to when an employee

complained about discriminatory work assignments could dissuade a reasonable worker from

making or supporting a charge of discrimination. Similarly, the remaining alleged adverse

employment actions, when taken together, could lead a jury to conclude that they were intended

to send the message that "this is not a place you complain." Accordingly, Marquez has

established that she was subject to an adverse employment action sufficient to establish her

*prima facie* case for retaliation.

### 2. Employer Justification

Since Marquez has established a *prima facie* case, defendants must articulate legitimate

non-retaliatory reasons for the adverse employment action. Defendants "need not prove the

absence of retaliatory intent or motive; [they] simply must produce evidence sufficient to dispel

the inference of retaliation raised by the plaintiff." *Cohen*, 686 F.2d at 796 (citations omitted).

This is merely a burden of production as the ultimate burden of persuasion remains with Marquez

at all times. *Id*. at 796-97.

Defendants assert Marquez was mistakenly placed on probation because superintendent

_____

(D. Or. 2004). For purposes of summary judgment, the court considers Marquez's membership
in a protected class sufficient to satisfy the first prong of her *prima facie* case, rather than
analyzing whether her complaints rose to the level of protected activity. The nature of her
complaints is an issue reserved to the fact finder after hearing all the evidence and evaluating the
credibility of the witnesses.

Savage was under the impression that all classified employees such as Marquez had a six-month probationary period, when in fact, there was no such probationary policy in place.  (Savage Depo. at pp. 86-88.)  Operating under this false impression, he wanted to extend the probationary period that he believed to be in place because he wanted to see how the custodians worked together through the winter athletics season.  (*Id*. at pp. 83-85.)

With regard to the additional adverse employment actions alleged by Marquez, defendants assert that when Marquez inquired how to file a complaint, at least three defendants, Talbot, Dennis, and Fisher, discussed sections in the policy book in an attempt to provide her with the proper procedure.[7]  (Talbot Depo. at pp. 38-39; Dennis Depo. at p. 68; Marquez Depo. (Vol. I.) at pp. 145-46; Fisher Depo. at pp. 13-14.)  As far as placing Marquez's name on the agenda, defendants assert that when someone has something to discuss with the board, they put it on the agenda, which is routinely posted in several public places around town.  (Savage Depo. at pp. 101-03.)  Marquez was not permitted to read her statement in the public session on advice of OSBA counsel.  (*Id*. at p. 178; Steele Depo. at p. 63; Dennis Depo. at pp. 94-95; Fisher Depo. at pp. 16-17.)

Defendants assert that the division of duties was not in retaliation to Marquez's complaints, but based on the historical division of duties, Casiano's seniority, and practical necessity.  In support, they rely upon the division of duties created by the first pair of custodians,

_____

[7]  Marquez disputes that Talbot ever provided her with a form, while Talbot remembers that he provided her with one at Steele's request.  (*Compare* Marquez Depo. (Vol. II) at p. 57 with Talbot Depo. at pp. 38-39.)  Instead, Marquez claims that he pointed to a section in the policy book entitled "Staff Complaints," which was not the section she needed, while covering another section with his hand, leading Marquez to believe that he was trying to mislead her. (Marquez Depo. (Vol. I) at pp. 219-23, (Vol. II) at pp. 58-59.)

Bertalotta and Tuttle, and passed down to each subsequent custodian. As discussed next, the record is clear that this division of work responsibilities remained the same for each pair of custodians after the list was created, and was ultimately used to formulate the two job descriptions adopted by the school board in response to Marquez's complaints.

These are all legitimate, non-retaliatory justifications for the actions taken by defendants.

### 3. Pretext

Because defendants have produced legitimate justifications for their actions, "the legally mandatory inference of retaliatory discrimination arising from the plaintiff's *prima facie* case drops away." *Yartzoff*, 809 F.2d at 1377 (citation omitted). The burden of production falls on Marquez to show that defendants' explanation is a pretext for impermissible retaliation. *Id*. "This burden merges with [Marquez's] ultimate burden of persuading the court that [she] is the victim of retaliation." *Id*. Pretext may be established in one of two ways: "(1) indirectly by showing that defendant's proffered explanation is 'unworthy of credence' because it is internally inconsistent or otherwise not believable; or (2) directly, by showing that unlawful discrimination more likely motivated the employer." *Chuang,* 225 F.3d at 1127. In considering these, "[e]vidence already introduced to establish the *prima facie* case may be considered . . . ." *Yartzoff*, 809 F.2d at 1377. "When that evidence, direct or circumstantial *consists of more* than the [*prima facie*] presumption, a factual question will almost always exist with respect to any claim of nondiscriminatory reason[,]" but "in those cases where the *prima facie* case consists of no more than the minimum necessary to create a presumption of discrimination . . . , plaintiff has failed to raise a triable issue of fact." *Wallis*, 26 F.3d at 890 (internal quotations, citation omitted) (emphasis and brackets in original).

Page 29 - FINDINGS AND RECOMMENDATION

Viewing the cumulative evidence, the record establishes that defendants' explanations are unworthy of credence.  The historical division of duties relied upon by defendants is well established in the record, but it is also clear that every female custodian who was hired was informed by the male custodian what her duties were, and those duties always primarily consisted of cleaning work.  The custodian position was originally filled by just one man, Harold Bertalotta, who performed all of the tasks, including cleaning, maintenance, and groundskeeping.  (Tuttle Depo. at pp. 7-9.)  At some point, a woman was hired to assist Bertalotta.  (*Id*.)  The first woman hired, Margaret Tuttle, characterizes her role as that of "helper" to Bertalotta, and describes that they divided the custodial duties in such a way that she performed most of the cleaning and he performed most of the groundskeeping and maintenance work.  (*Id*.)  When Bertalotta left, another man, Casiano, was hired, and the division of duties remained the same, even though Tuttle had more seniority.  (*Id*.)  After Tuttle retired, another woman, Kelly Conro, was hired to replace her.  (Conro Depo. at pp. 8-9, 24.)  Conro continued to perform all the cleaning and inside work, and Casiano all the maintenance and outside work.  (*Id*. at pp. 8-9, 24.)  When Conro left, the school district hired a third woman, Marquez, and the division of duties remained much the same.  (*See* Marquez Depo. (Vol. I) at pp. 69-70, (Vol. II.) at pp. 21, 24, 28-31; Ex. 102.)  After Marquez quit, the board formally adopted the two different job descriptions and hired a man to replace her.  (Savage Depo. at pp. 33-35, 116, 119-20; Talbot Depo. at pp. 66-67; Exs. 2, 3.)  While there was indeed a history of division of responsibilities between the two custodians, a reasonable fact finder could conclude that defendants retaliated against Marquez for refusing to acquiesce to this discriminatory division of duties.

Similarly, defendants' argument that Casiano's seniority allowed him to dictate who

performed what duties is not worthy of credence.  When Casiano was hired, Tuttle, a woman,

was the senior custodian, yet Casiano assumed the same responsibilities as Bertalotta, which

included primarily maintenance and groundskeeping work, with very little inside and cleaning

responsibilities.  (Tuttle Depo. at pp. 7-9.)  This fact casts doubt on the legitimacy of defendants'

allegedly non-retaliatory reason for their actions.  Moreover, when Marquez brought what she

felt was an unequal division of duties to defendants' attention, instead of examining the work

load distribution, defendants formally imposed probation on her.  (Marquez Depo. (Vol. I) at pp.

129-30; Savage Depo. at pp. 83-88; Talbot Depo. at pp. 41-44.)  When Marquez finally made a

formal complaint, defendants ended up adopting the work division according to the way it was

historically divided, and which formed the basis of her complaint.  (*See* Savage Depo. at pp. 33-

35, 116, 119-20; Exs. 2, 3.)  The school board members were not in agreement regarding whether

they thought the adoption of two job descriptions would adequately address Marquez's

underlying concerns.  (*Compare* Olson Depo. at p. 24; Haueter Depo. at pp. 28-29.)  Thus, a

reasonable fact finder could conclude that defendants had a history of discriminatory work

division among the male and female custodians, and that when Marquez complained about it,

defendants placed her on probation and engaged in various other actions in order to deter her

from pursuing her complaint, ultimately resulting in constructive discharge.

Defendants' argument that practical necessity justified the division of duties is also

suspect.  At the time that Marquez was hired, there existed only one job description which did

not explicitly divide responsibilities between the two custodians.  (Marquez Depo. (Vol. I) at

pp.62-63, (Vol. II) at p. 120; Talbot Depo. at pp. 56, 65; Exs. 1, 102.)  While there was a

document memorializing the informal division of duties discussed above, the position itself did

Page 31 - FINDINGS AND RECOMMENDATION

not so differentiate.  (*Compare* Ex. 1 and Ex. 102.)  The record indicates that there was at least

one occasion when Casiano was not immediately available to perform a maintenance task, but

Marquez was in the immediate area and would have been able to respond in a timely manner had

she been permitted.  (Marquez Depo. (Vol. II) at pp. 32-33, 36-37, 39-40.)  In such a situation,

practical necessity would dictate that both custodians be trained on such tasks, in the event that

one is not available.  A reasonable fact finder could conclude that the division of duties was not

out of practical necessity, but in order to maintain the historic discriminatory division of duties,

and that when Marquez began complaining about this treatment, she was retaliated against,

beginning with being placed on probation and culminating in constructive discharge.

Marquez has provided specific and substantial evidence sufficient to demonstrate that

defendants' reasons for placing her on probation were in retaliation for complaining of sex

discrimination.  Despite carrying her burden, there are  many disputed issues of material fact

regarding defendants' motivation for taking the alleged adverse employment actions against her,

thereby precluding summary judgment in favor of either party.  Therefore, both plaintiff's and

defendants' motions should be denied on Marquez's First, Third, and Fifth Claims for retaliation

under state and federal law.

## II.  Common Law Claims

Defendants assert that they are entitled to summary judgment on Marquez's common law

claims because she cannot establish her *prima facie* case for any of those claims.  Marquez

asserts that she has stated a claim and that material issues of fact persist, thereby precluding

summary judgment.

## A.  Wrongful Termination (Sixth Claim)[8]

Marquez's Sixth Claim alleges that defendants' constructive termination of her

employment was substantially motivated by her complaints of discrimination and in retaliation

for exercising her rights as an employee.  (Amended Complaint at ¶ 73.)

> Under Oregon law, a wrongful constructive discharge occurs where:
>
> (1) the employer intentionally created or intentionally maintained specified working conditions;
> (2) those working conditions were so intolerable that a reasonable person in the employee's position would have resigned because of them;
> (3) the employer desired to cause the employee to leave employment as a result of those working conditions or knew that the employee was certain, or substantially certain, to leave employment as a result of those working conditions; and
> (4) the employee did leave the employment as a result of those working conditions.

*McGanty v. Staudenraus*, 321 Or. 532, 557, 901 P.2d 841, 856-57 (1995) (footnotes omitted).

In order to survive a motion for summary judgment, Marquez must show that "there are

triable issues of fact as to whether a reasonable person in her position would have felt that she

was forced to quit because of intolerable and discriminatory working conditions."  *Steiner v.*

*Showboat Operating Co.*, 25 F.3d 1459, 1465 (9th Cir. 1994), *cert. denied*, 513 U.S. 1082 (1995)

(internal quotation and citation omitted).  Intolerability must be present at the time of resignation.

*Id*.

Marquez advances many of the same arguments and factual support as she did in support

of her discrimination and retaliation claims, namely that plaintiffs had long maintained

---

[8] The Amended Complaint mistakenly lists this as the "Fourth Claim," but it is clear that it is intended to be the Sixth Claim for Relief, since there is another "Fourth Claim," which is the state sex discrimination claim.  In the interest of clarity, the court will refer to the wrongful termination claim as the "Sixth Claim."

intolerable working conditions based on sex-based stereotypes. When she complained about these conditions, she was placed on formal probation, the conditions worsened, and the school board ultimately formalized the very conditions which she considered intolerable. As discussed above, defendants vigorously dispute Marquez's interpretation of the evidence, and the record does not establish, one way or the other, whether the division of duties was based on kind of discriminatory animus or a long held division of labor. This is an ultimate issue of fact for the jury to decide after hearing all of the evidence and an opportunity to evaluate the credibility of the witnesses, thereby making summary judgment on this claim inappropriate. Therefore, defendants motion for summary judgment on the Sixth Claim should be denied.

### B. Intentional Infliction of Emotional Distress (Seventh Claim)

In her Seventh Claim, Marquez alleges that defendants intentionally discriminated and retaliated against her for reporting that she was subject to a discriminatory division of duties based on sex stereotypes, which has resulted in emotional harm, humiliation, embarrassment, and physical injury. (Amended Complaint at ¶¶ 75-78.)

Under Oregon law, to prevail on a claim for intentional infliction of emotional distress ("IIED") a plaintiff must prove that "(1) the defendant intended to inflict severe emotional distress on the plaintiff, (2) the defendant's acts were the cause of the plaintiff's severe emotional distress, and (3) the defendant's acts constituted an extraordinary transgression of the bounds of socially tolerable conduct." *McGanty,* 321 Or. at 543, 901 P.2d at 849 (citation omitted).

Oregon courts have held that the "trial court plays a gatekeeper role in evaluating the viability of an IIED claim by assessing the allegedly tortious conduct to determine whether it goes beyond the farthest reaches of socially tolerable behavior and creates a jury question on

liability." *House v. Hicks,* 218 Or.App. 348, 358, 179 P.3d 730, 736 (Or. Ct. App.), *rev. denied*, 345 Or. 381, 195 P.3d 911 (2008) (citation omitted).  "Whether conduct is an extraordinary transgression is a fact-specific inquiry, to be considered on a case-by-case basis, based on the totality of the circumstances.  [The court considers] whether the offensiveness of the conduct exceeds any reasonable limit of social toleration, which is a judgment of social standards rather than of specific occurrences." *Id.*, at 358-59, 179 P.3d at 736 (internal citation and quotation omitted).

While several contextual factors guide the court's analysis, the most important is whether the parties are in a special relationship, such as that between an employer-employee. *McGanty*, 321 Or. At 547-48, 901 P.2d at 851-52.  The relationship may be one that "imposes on the defendant a greater obligation to refrain from subjecting the victim to abuse, fright, or shock than would be true in arm's-length encounters among strangers." *Id*.

Here, Marquez and defendants, as employee-employer, had a special relationship that potentially heightened the outrageousness of the conduct.  However, the specific conduct that Marquez complains of is insufficient to establish her *prima facie* case for IIED.  Even considering all of Casiano's actions, which allegedly included derogatory sex-based comments, sabotaging her work, providing her with a pink, flowered screwdriver as a tool, and denying her access to any other tools or maintenance equipment, defendants' conduct does not go beyond the reaches of socially tolerable behavior.[9]

---

[9]  At oral argument, Marquez clarified that she is not alleging a sexual harassment or hostile work environment claim based on Casiano's treatment of her.  Instead, she claims that this course of conduct was discriminatory, and that when she reported it, she was retaliated against.  Accordingly, the court will not discuss in depth the individual acts Casiano engaged in, except to the extent that they represent a division of work duties based on sex stereotypes.

Marquez alleges that after she complained of Casiano's treatment, defendants threatened her with discipline by way of referencing an ethics policy that prohibits discussing other employees' work performance with other employees, placed her on probation, and misled her about the proper procedure to file a complaint. When she finally filed her complaint, her name was placed on the publicly posted agenda, in reference to a discrimination complaint, but without any indication of whether it was brought by or against Marquez, thereby causing her humiliation and embarrassment. This embarrassment was compounded when at the board meeting she was not permitted to read her statement in the public session. Instead of investigating her complaints, she was then prohibited from performing any maintenance work, her supplies were not delivered to her, and when she responded to a fire alarm, she was not permitted to turn it off. Eventually, defendants adopted two separate job descriptions, thereby formalizing the discriminatory division of work responsibilities that was causing her such distress and formed the basis of her complaint. While this conduct is distasteful, it does not rise to the level of outrageousness required to satisfy the third element of an IIED claim. Accordingly, defendants motion for summary judgment on the Seventh Claim should be granted.

### C.  Negligent Hiring, Supervision, and Retention (Eighth Claim)

Marquez's Eighth Claim alleges that defendant board members negligently supervised supervisory employees Savage and Talbot, thereby allowing them to engage in discriminatory and retaliatory conduct against her, that they failed to establish policies sufficient to prevent this conduct, and that they failed to adequately investigate her complaint. (Amended Complaint at ¶¶ 79-85.)

To sustain a claim for negligence, a plaintiff must allege that: (1) the defendant owed a

duty; (2) the defendant breached that duty; and (3) that breach was the cause in fact of some legally cognizable damage to plaintiff.  *Chesterman v. Barmon*, 82 Or. App. 1, 4, 727 P.2d 130, 131 (1986).  The key issue in a claim for negligent supervision is "whether, in light of what the [employer] knew or should have known about the [employee], the [employer] could reasonably foresee that the [employee], if inadequately supervised, would engage in the kind of conduct that ultimately harmed the plaintiff."  *M.N.O. v. Magana*, 2006 WL 559214, at *20 (D. Or. March 6, 2006) (citing *Washa v. Dep't of Corrections*, 159 Or. App. 207, 225, 979 P.2d 273, 283 (1999), *aff'd* 335 Or. 403, 69 P.3d 1232 (2003)).  Foreseeability "generally presents an issue of fact, and, therefore, is not a likely candidate for summary judgment."  *Id.* (citing *Cunningham v. Happy Palace, Inc.*, 157 Or. App. 334, 337, 970 P.2d 669, 671 (1998), *review denied*, 328 Or. 365, 987 P.2d 510 (1999)).

Here, Marquez alleges that the defendant board members were negligent in their failure to respond and investigate her complaints, and in their retention of Savage, Talbot, and Casiano, despite knowledge of their discriminatory tendencies.  In support, Marquez points to not only her own complaints to board members Dennis, Shelly, and Fisher, but also the testimony that other women had experienced similar problems.  (*See* Tuttle Depo. at pp. 19-20 (custodian Tuttle's issues with Casiano, and her reports to Savage); Conro Depo. at pp. 8-15, 17-23 (custodian Conro's issues with Casiano); Williams Decl. at ¶ 5; Steele Decl. at p. 2 (temporary custodian's problems with Savage); S. Shenk Depo. at  pp. 7-8, 11-15, 21 (basketball coach Shenk's issues with Talbot and Savage and fear of retaliation for complaining); Dennis Depo. at pp. 133-34; Post Depo. at pp. 32-34 (board member Dennis' issues with Savage).)  While this testimony demonstrates that Marquez likely was not the first woman to experience discriminatory treatment

at the hands of Casiano, Savage, and Talbot, defendants dispute whether any of the defendant board members had actual knowledge of these prior problems, thereby creating an issue of material fact regarding knowledge and foreseeability.  Accordingly, summary judgment on Marquez's Eighth Claim is not appropriate, and defendants' motion should be denied.

## RECOMMENDATION

For the reasons set forth above, defendants' motion for summary judgment (docket #27) should be granted in part and denied in part.  Summary judgment should be denied on the First, Second, Third, Fourth, Fifth, Sixth, and Eighth Claims for Relief.  Summary judgment should be granted on the Seventh Claim.  Marquez's partial motion for summary judgment (docket #30) should be denied.

## SCHEDULING ORDER

The Findings and Recommendation will be referred to a district judge.  Objections, if any, are due fourteen (14) days from service of the Findings and Recommendation.  If no objections are filed, then the Findings and Recommendation will go under advisement on that date.

If objections are filed, then a response is due within fourteen (14) days after being served with a copy of the objections.  When the response is due or filed, whichever date is earlier, the Findings and Recommendation will go under advisement.

DATED this 24th day of March, 2011.

/s/ Patricia Sullivan
Patricia Sullivan
United States Magistrate Judge

Page 38 - FINDINGS AND RECOMMENDATION